Good morning, Your Honors. May it please the Court, my name is John Rubiner, and I represent NASA Special Agent Norman Connolly, and I'd like to reserve the last two minutes for rebuttal. I'd like to start by pointing out to the Court that just last month, the U.S. Supreme Court analyzed qualified immunity in White v. Pauli, 137, Supreme Court 548. In that case, the Court specifically stated that it was taking the case on appeal to remind the federal courts of the importance of qualified immunity, stating that qualified immunity is important to society as a whole, and important because it's effectively lost if a case is erroneously permitted to go to trial. And that's what we have here. Counsel, help me on something at a more specific, concrete level in this case. There were a few things that the agents knew. One was that the woman called NASA to assist her, and there are inferences that can be drawn from that. An important inference is that she was not keeping her moon rock that her husband had given her secret from the government, so she obviously did not have a consciousness that she was committing a crime. It also was probably evident just from her voice that she was an old lady. You wouldn't know that she was in her seventies, I think it was, and five feet tall, but you'd know she was an old lady. Why would you need six police of various types and restraints going into a discussion with an old lady like that who is seeking government assistance in selling her moon rock? Well, Your Honor, the woman contacting the NASA special agents was how this came to NASA's attention. They did have, and it's in the record, several communications with a confidential informant who was discussing matters with her. She had discussed with the informant that she understood that she may have to sell this on the black market, there may be some legality issues. Do we have that in the record? Yes, it is in the record. The black market part? It's marked in our brief. I don't have the exact pages in front of me. When I come back and rebuttal, I'll give you those. It could be of interest. Yes, and so the registered informant, she also told the informant that her husband had guns, had a gun collection in the home, and thought some of those may be illegal guns. So that's why the NASA agent Connelly, after speaking with the supervisor, obtained a search warrant. They set up essentially a sting at the Denny's. They didn't know whether she would have guns or not when she came. But she had called the government about the guns and said they were her deceased husband's. Not the guns, but the guns were her current husband's, the moon rock and the heat shield that she was trying to sell. Those were, she had said, came from her husband. Additionally, Mr. Connelly testified in his declaration, that was part of the record, that he had spoken with Neil Armstrong, who said that he didn't provide moon rocks to anyone. And moon rocks, as the law makes clear, are government property. I was wondering about that. My thought was, the agent says that Neil Armstrong told him this, but Neil Armstrong, of course, doesn't say it, since he, like the woman's husband who gave it to her, was deceased. And Rule 56, I think it's C now, it used to be F, had limitations on what evidence could be considered. That's just the plainest hearsay, and it doesn't seem to fall within any exception. So I don't see how it can be cognizable at this stage. Well, because this issue, what we're talking about is qualified immunity. And qualified immunity, we're not talking about whether Mr. Armstrong did or did not say that. The question has to do with what Mr. Connelly was thinking when Mr. Connelly sought, and he used the statement from Mr. Armstrong when he obtained the search warrant. Once the sting was accomplished and the moon rock was essentially taken away from her, what was the legitimate law enforcement role in terms of the way the detention was carried out in the parking lot? Well, and I think the issue with the detention is that Mr. Connelly was sitting in the car. She was standing. While she was, we're assuming for the purposes of this argument, she was in fact detained. He offered her to have her sit down in the car with him. She declined. She testified, and we pointed out in our brief, there's no way I'm sitting down with you. She refused to answer many questions, answered some others. And the legitimate law enforcement purpose was to determine, first of all, the legitimacy of her possession of the moon rock. Secondly, there was in the confidential informant tapes of the phone calls, there had been discussion about potentially other materials that she may have or other issues. And Agent Connelly was in the process of determining whether there were other places to look, whether she had other material, whether other people had the material, or how she came into possession of the moon rock. There's no dispute. While he did, for this purpose, one-and-a-half to two-hour discussion, he didn't, there's no allegations that he went into some other areas or didn't talk about moon rocks. Well, the search was complete at this point. I'm sorry? The search was complete. The search had been complete. Right. So this is an additional two-hour detention and questioning after the search was complete, and there was no arrest warrant issued, true? No. But the detention subject to the, asking her questions, there was at least to Agent Connelly's position that she had consented to the search. But even if it was... Right. But you know what the district court found? It didn't rule definitively on any of these matters. What it said was there are genuine issues of material fact that preclude summary judgment as to, on the issue of qualified immunity. And you have given some of the statements that I'm sure that the agent will testify at trial if you get that far. But at summary judgment stage, we have to credit the plaintiff's testimony and allegations as true. So we all know, I think it's undisputed, it's one-and-a-half, two hours. We all know that she had some humiliating experiences during that one-and-a-half, two hours. So in terms of where you started, how does that square with Foxworth? When Foxworth says a detention conducted in connection with a search warrant may be unreasonable if it's unnecessarily painful, degrading, or prolonged, or it involves an undue invasion of privacy. Detentions, particularly lengthy detentions of the elderly or of children or of individuals suffering from serious illnesses or disability, raise additional concerns. Why doesn't that indicate there's a genuine issue of fact? Well, first of all, the question is whether it was clearly established law at the time for Agent Connolly to understand that what he was doing was in fact a violation of the law. If you look at the facts of Franklin, it's a far cry from this. That's a non-suspect who was in his home. He was handcuffed. He had multiple sclerosis, couldn't walk, had bowel issues, was wearing a T-shirt, was left out in basically with his genitals exposed to 23 officers for over two hours. That's a far cry from a woman wearing wet pants. Now, it certainly was uncomfortable. The testimony is not that it was, you know, in the other cases. For example, in Crosby where a woman was naked in a shower, the police officer pulled her out, said, stay here, didn't allow her to cover herself up and had the door open with male officers walking all around. Even if you would find that Connolly went too far, the question the court has to ask is, was the law so clear that in this context, and I think White makes clear that the court really has to look very carefully at the facts and at the law to determine whether there's a basis for the officer's conduct and a finding that only the most incompetent officer would make that determination. What was the justification for not letting her go to the bathroom? The record's unclear as to who she asked to go to the bathroom and whether she wanted to go to the bathroom. Her testimony is that she asked. I thought she said she wanted to go to the bathroom, they wouldn't let her, and she urinated in her pants and then was displayed out there for all that time. That's not exact. I don't believe that's exactly what the facts are. The facts are that she testified that at some point she urinated on herself between the. . . I thought she said that she asked to go to the bathroom when they. . . Testified that she asked to go to the bathroom. She doesn't testify she asked Inspector Connolly if she, Special Agent Connolly, if she could go to the bathroom. But is the record clear that Agent Connolly was asked to allow, to allow her to go change and clean herself up and that was denied? No. The record is not clear on that at all. There's no evidence that she made any of those types of requests. There was evidence that she requested to. . . She says she requested to go to the bathroom. In her deposition, she said that it was people. . . She asked people other than Agent Connolly about going to the bathroom and that by the time, you know, it's nighttime at a Denny's in the parking lot, it's. . . We're assuming for now. Here's what she says in her declaration. I was taken outside into the parking lot. I was there for two hours. Of course, Connolly and the other officers would not let me go to the bathroom or dry myself where I was wet with my own urine. Right. So why do you say that she doesn't say anything about Agent Connolly? Well, in her deposition, which was done after that, it was did you ask Agent Connolly? And we cited in our brief the exact page numbers in her deposition where she referenced it. And she did. . . She testified she didn't ask Agent Connolly, that she asked the officers who were escorting her out. And so that issue, she didn't testify that. . . She testified she asked somebody. But, again, we're looking at multiple officers. Right. But I think your answer is a little bit different from what her affidavit is. She doesn't. . . We talked about who she asked. She said Connolly would not let me go to the bathroom. Now, that could be whether she asked or not. It could be whether she asked or not. And the question, I think, then comes back to even if you would find that it was a constitution, that somehow he should have constitutionally had an obligation to allow her to go to the bathroom, was that law clear based on the Franklin v. Foxworth case? This is not habeas where the petitioner has to show a holding not dictum of Supreme Court decision directly in point. This is qualified immunity where, in some circumstances, you don't even need a case directly in point if any reasonable officer should know better. That's right, Your Honor. And I think White, just last month, the Supreme Court made clear it needs to be clearly. . . Also, we take the facts most favorably to her for purposes of this summary judgment. And if she says Connolly wouldn't let me go to the bathroom after I asked to go to the bathroom, the reasonable inference would be either she asked Connolly or she asked the other officers within the hearing of Connolly and he said no, or the other officers heard her ask and asked Connolly can she go to the bathroom and he said no. Those are the inferences that I would draw from the way she put it in that testimony that Judge Thomas just read. Right. And I believe that even using, assuming all of that, that the question is whether it was clearly established law that not allowing her to go to the restroom at that point was clearly established, not at a level of generality. Even, and I think the problem is that the Franklin case really keeps the indicia of what is a problematic detention unnecessarily painful, degrading, prolonged, or an undue invasion of privacy. It's still a pretty high level of generality as to what an officer on the scene is supposed to determine. Is it if somebody urinated or is that automatically something that you will then allow the person to go to the bathroom, to go to use the restroom? What are the other circumstances that are going on? Could things be changed? That's the problem with this case. And then looking at the other cases. Are you really saying that during a search where there's no arrest warrant issued that it's, that officers wouldn't understand that an elderly person who asked to go to the bathroom ought to be allowed to go to the bathroom? I mean, what is the support for the government saying, gee, I don't know whether or not somebody who's elderly, as was the case in Franklin, at least in the dicta I read. Right. Well, for example, in the Hunter case, where there was a person that was in bed in her underclothes when the police showed up, she said, can I use the bathroom, in the context of a search, because she was taking medication that caused her to frequently urinate and frequently defecate. She, in fact, they said no. She, in fact, urinated and defecated on herself during the course of this search, and the court found that was not, that qualified immunity would still apply. So to the extent that you have this case law that's somewhat ambiguous at best and really unclear. Well, that's why I asked you about the law enforcement purpose, because the search for the moon rock was essentially over. There was some detention beyond that. And I think the record supports the fact that the agents wanted to essentially interrogate her further, and that's why they detained and held her there. So it's what happened during the course of that and whether it's tethered to any legitimate law enforcement purposes under the circumstances of this case, you know, involving a moon rock that she had initially reached out to the government and she had an explanation. They set up a sting. They took the moon rock. She needed to use the restroom, and she was denied that right. And then after she urinated on herself, she asked for an opportunity to change and was denied that right. So you think that the current case law doesn't support a finding that her right not to be subjected to prolonged detention under those degrading circumstances, that's not clearly established enough? Yes, Your Honor, I do think that that's the case of the law right now. Prolonged is a vague term. It's not clear whether it's prolonged. Is an hour-and-a-half prolonged, but two hours is too long? Is two hours not prolonged, but two-and-a-half hours is okay? That's the problem. That's why the Supreme Court is looking at these cases and saying to the federal courts, generalities aren't good enough. General statements of the law, even general statements that it can't be prolonged, degrading, or an unnecessary invasion of privacy or humiliating, that, again, is a generality. And the reason, I mean, in the cases that the U.S. Supreme Court was looking at, they're deadly force involved in finding that qualified immunity applies because of the nature of the law enforcement, because of the societal importance of law enforcement and looking into it. It wasn't just the moon rock that they were looking for. She was talking about selling government property. They needed to, you know, there was legitimate government pay. But the search was complete. The search was complete. Yes, they had recovered the moon rock and questioned its unclear, you know, for the purposes of this argument. Did the warrant cover, did the search warrant cover any other things besides the moon rock and any other material that she had discussed? Well, any other evidence of criminal conduct, but the moon rock was essentially what they were looking for. They took that and didn't take anything else. They gave her a receipt for the moon rock. Judge Kleinfeld has a question. Did the officers testify in their declarations or their depositions that they were concerned that she was armed or might be armed? Not at the time of the detention. They were concerned at the time of the initial, when the sting, when it came out. They didn't know whether she had weapons or not. They were concerned. Wait, when the sting, when it came out, I'm not sure if you're talking about the phone call or sitting at the table. Sitting at the table at Denny's. They did testify. They didn't know. They patted her down. They patted down her husband. It would be easy enough if they thought that she or her husband might have a gun, which I don't think they said, that they could have held her purse at the table and held her husband at the table and let her go to the bathroom. Right. Well, it's not clear that she, she didn't testify as to when she urinated on herself, whether it was inside the Denny's or whether it was out in the parking lot, and that they left the Denny's. I thought taking the evidence most favorably to her, it was after she said, I have to go to the bathroom, and as she was going to the parking lot with them. Yeah. I mean, but, again, whether they were already walking at the time it happened and they were on their way out versus whether she was sitting at the table at the Denny's. They did determine that the police officers were concerned she had a weapon. She didn't. And they did determine right away that she didn't have any. She and her husband didn't have any weapons. And her husband was very cooperative and discussed his gun collection with one of the other officers. So the idea that there was further concern about weapons when they were in the parking lot,  Thank you, counsel. Thank you, Your Honor. Peter Schluter for Ms. Davis. I would just make a comment on we were talking about arming. The police at NASA decided to do this at Denny's, and it was not at nighttime. It was at noon during lunch hour. Had they thought for one second that anyone was going to be armed or there was a danger, they would not have chosen a crowded Denny's place, which is a family-friendly restaurant with children. So they speak about being worried about a weapon or a firearm, but, in fact, if they had any concern about that, they would not have chosen a Denny's for this seizure. We have a case here where, as the courts were pointing out, a woman went to NASA and asked for their help to sell a moon rock because she had run into financial problems and her son was sick. And instead of calling her back or just talking to her, they created a sting. Now, Counsel, there was a question about whether she wanted to sell it to the black market. Clearly that beginning does not suggest that. Also, the record does not show. Clearly what? Clearly the record shows that she wanted to do this legitimately. She was not going to use the black market. You didn't tell them she was thinking she might have to sell it on the black market? No. In fact, the quote is, I don't have black market contacts. And, in fact, she was worried about the tax consequences. And when the quote-unquote confidential informant, who actually wasn't confidential because he gave his full name, talked about a cash payment, she didn't want a cash payment because she wanted it in check. And those are in the conversations that are attached to the search warrant that are recorded. So this was an elderly woman who had found that they had this moon rock, and for 40 years they had this paperweight, not knowing its value. And, in fact, arguably when they first got it, it obviously was worthless to somebody because somebody put a moon rock into a paperweight, and as the family lore goes, was given to her husband, who then promptly put it in with the rest of the awards that he got because he was an engineer with aerospace, and she also worked for aerospace. So in the context of having this woman contact NASA, who had led a legally blameless life, they then lure her to Denny's, whereupon they basically jump her with four officers. What do you do about the cases? I know Franklin and Foxworthy is very helpful to you. Right. But there are some other cases where there have been humiliating, degrading searches, and the justification for it isn't clear. And we and other courts have said, well, it's okay. That's not any kind of violation that should be obvious to a reasonable officer. What do you do about the cases you need to distinguish? Sure. In Crosby, that was a case in which there was a drug search warrant. A male officer, they were clearing the house. A male officer went into the bathroom. A female was taking a shower. They then substituted immediately. He called out a female officer needed, and a female officer then was in the doorway of the bathroom. And, in fact, in that case, the detention was only 15 or 20 minutes while the search warrant was being worked on. That is, while they were conducting the search warrant. It wasn't afterwards. And there was clothes in the bathroom that she could have availed herself of, and the court pointed that out. She just chose not to because it was men's clothing. So if she wanted to cover herself, she could have. And the female deputy stood in the doorway of the bathroom. And, most importantly, this was inside her own home, or the home that she was at. Now, in this case, Ms. Davis is in public during lunch hour, and she is exposed to the lunch crowd in urine-soaked clothing for two hours. That is, she was roughly handled. So when they grabbed, they grabbed the moon rock immediately. And she's sitting there at a Denny's booth. And upon a signal, they descend on her. They immediately grab the moon rock, and Connolly grabs her purse and takes it out. So Connolly already had her purse while they're sitting at the table? Connolly grabbed it. Well, no, they actually dragged her out. They pulled her out of the booth. So it wasn't that it was a nice, comfortable sit-down-let's-talk. They actually pulled her out of that booth. And, in fact, she was injured. Where was her purse when they pulled her out of the booth? The purse would have been next to her, either to the left or to the right. Was she carrying it? No. So she couldn't have anything in her purse with her? What I'm trying to find out is suppose you do fear that a suspect has contraband or weapons in her purse. If she's separated from her purse, it's no threat. If she's not separated from her purse, it might be a threat. If she goes into the bathroom, she could put the contraband in the toilet tank or something like that. And I'm trying to find out where her purse was. It was immediately seized by Connelly. That is, they pulled her out and her husband, and this was the second husband, frisked them both, took control of the purse, and had control of the moonrock. So they had the moonrock and the purse when she urinated in her pants? Yes. And then she was let out. Connelly and the group went out. There were two sheriff's officers on either side. She complained about wanting to go to the bathroom. She lost bladder control as she was walking to where they finally stood her and where she stood for two hours. Does she dispute the fact that Agent Connelly gave her the option of sitting inside the SUV? You mentioned that she was exposed to the public. Right. She was given an option to sit inside an SUV, and she declined that, right? Right. And the reason she declined it was because Connelly, during this period of time, was going back and forth saying, my superiors want to have you taken in. They want to, in essence, have you arrested. Give me some more information. And so there was this threat involved, and she didn't want to go any closer to that threat and get into the car because that would be one more step to full custodial interrogation. She didn't want to take that step, and she's testified to that. Is discovery complete? Discovery is completed. Okay. Go ahead with your thought. I'm just curious. So she stood there for two hours, and what's in the record is that she was standing there, and any time she would move, there was an officer directly behind her who would touch her and basically nonverbally tell her not to move. So she was controlled. So the issue here is — What is the clearly established right that you're relying on? Can you articulate that for me? Yeah. There was a case that was decided by this court, Young v. the City of Visalia. It was unpublished, but the U.S. District Lexus site is 2012 U.S. District Lexus 124548. And in it, they discuss that qualified immunity, and they discuss that based on the cases of Meredith Ganwich and Franklin, the degrading nature of not allowing someone to go to the bathroom is well enough established that the officer would have been put on notice. Ganwich was a case in which — make sure I do not misquote it. That was a case — they mentioned that not allowing someone to go to the bathroom can be a Fourth Amendment violation. It can be weighed in the totality of circumstances, and they make note of that under footnote five of that decision. Ganwich is 319F3RD115. And so there are cases out there that would say that that's a factor to examine. And as the other case, the Franklin case mentioned, you looked also at the elderly, who you have. And in all the cases like Crosby and Hunter, the search was still continuing. That is, the detention was only during a search, and we don't have that here. We have a detention that is extending beyond when they obtained the object of the search. And the object of the search was two things. One, they wanted to get the moon rock back, and two, the search warrant allowed them to search her personal effects for papers related to the moon rock paperweight. Additionally, the conversation that Conley had wasn't just confined to that paperweight, but it was a discussion of who else might have one. So it was a basic generalized, not a discussion of whether she had committed a crime, but they were trying to find out who else might not have. So it was a generalized discussion, and there was no independent. Let me put it this way. Once they had seized everything, Agent Conley did not obtain any independent knowledge to justify further detention or suspicion of any further crime. So his was just a fact-finding mission for two hours, which is one that, in a coercive situation with law enforcement around her, with her husband separated from her and not knowing where he is, being stood in public and urinated in drenched clothes. And in the record, she mentions that she had urinated from the pubic area all the way down into her shoes. And the argument that she didn't ask to go to the bathroom or to go seems to be a wrong argument. The point is she asked to go to the bathroom, and the officers took control of her choice and did not allow that. She doesn't have to make a query as if she's in court asking for every type of eventuality. It was clear that she was detained, and it was clear that they were controlling her. Mr. Stanley, could you help me on a little technical point here? Sure. I'm still wondering whether on a qualified immunity decision that's resolved by a summary judgment, the court can consider for purposes of the agent's state of mind and not the agent's hearsay proffer that a dead man told him that he never gave a moon rock to anyone. I don't know if that's true. He certainly could not say it at trial, and Rule 56 says it can't be considered on summary judgment. I wonder if it can be considered for a limited purpose or if it can't be because it would be just so easy to make it up and it's the plainest hearsay. Well, it certainly would be easy to make up, and we subsequently learned that Armstrong had a collection for himself, but that's not in the record here. I don't know what the answer is to that question. I thought it was a minor point. It ended up that she did have a moon rock. It was clear she had a true lunar sample. And it wasn't just a little rock in a paper bag. It was a paperweight. It was a small grain of lunar sample the size of a rice grain that was stuck inside of a paperweight, and because of that, that should have told anyone that this was not the spoils of some ill-gotten gain, that no one steals something to put it into a paperweight and keep it around for 40 years. She clearly did not have a guilty mind, which is obvious because she called NASA to see if she could sell it. Thank you, Counsel. We'll give you your two minutes for rebuttal. I'll be brief, hopefully even less than two minutes. I just wanted to respond to the question you had asked. As it relates to the communications with Mr. Armstrong and the confidential informant, the issue how that came up was in the context of the search warrant application. And we're not quashing a search warrant and whether that issue could come up or not. There was a valid search warrant. It could be considered for a search warrant, no problem with that. That's right. And the affidavit is at pages 380 to 387. That's for the search warrant. That's the search warrant. You can use hearsay to get a search warrant. You can't use hearsay to get a summary judgment. That's right. And I don't believe anybody was relying on Mr. Armstrong's statements as a basis for the summary judgment. I was wondering here. It wasn't clear to me that it was illegal for her to have a moon rock. I guess it wasn't so clear to the prosecutor either since he didn't prosecute. And I looked at the stuff you cited, and it looked like it was, at the time, it doesn't appear to have been illegal, and there appears to be a directive to NASA, don't give out moon rocks, basically. But that doesn't mean it's a directive to other people, don't possess moon rocks. Your Honors, I think the case law has been in the statutes that we cited and described the background of it, that moon rocks, and it is a piece of almost a piece of dust. It's almost an insult to rocks to call it that. But it's like the size of a grain of rice. The moon or material, anything that came back. Assuming that Neil Armstrong really did give it to her husband in gratitude for his services as an engineer, it might have been that Armstrong could have gotten in trouble. I don't understand why her husband could have gotten in trouble. Well, it's, again, possession of stolen goods, whether it was Neil Armstrong who stole it or somebody else who stole it, or however she got it. Ultimately, the government may have determined. Where does, what law established that it was stolen? No one, there is no, well, it came from NASA program. A moon rock only comes in. The NASA policy directive, that doesn't say anything about title. It just tells NASA employees how to behave. But in order to say something about title, you'd need something else. Well, the NASA statute stated that all. Right, but that was repealed at the time, right? It wasn't in effect. But the, well, certainly the reasonable officer in Mr. Connolly's position was such. Well, no, the question is, you were starting to rely on a statute. Was it in effect at the time or not? I believe that it was. I don't think so, but you might want to check that. I'm sorry, Your Honors. I just, I can file something. I just don't recall at the top of my head. What a reasonable officer does, or does not do, has to be affected by what law it is that he's purporting to be enforcing. Right, but he, and he used that law. Like when police commonly will, well, I shouldn't say commonly, will tell somebody, you can't take pictures of me. And there's no law against taking pictures of them. So the policeman arrests somebody and he says, gee, I was just, I didn't know that was unreasonable or against the law to take pictures of somebody. But there's no law that he's relying on. He's just making it up. I was wondering if that's what happened here. Yeah, in this context, he used that law to get a search warrant. He relied on that and obtained a search warrant from a judge in the Central District of California. Part of that search warrant was his understanding that having and stating in the search warrant that he understood that possession of the moon rock itself would be a violation of the law. Well, possession with knowledge. Well, and he didn't know. That's what they were investigating, that she may have received the government's property with knowledge that it was embezzled. And there's all sorts of reasons why the government would have determined not to go forward with the prosecution, even if they felt she was guilty of a crime. Usually when you give a speech or retire from some public office that has a term, well, like, oh, our local bar president just finished her term and we gave her a gavel. Well, there's no certificate that goes with a gavel. There's no deed. There is no document establishing a transfer of ownership. These souvenirs, things encased in lucite, gavels, that sort of thing, you infer from the form of it itself that it's a legitimate gift. The Army gives people those little coins if you give a talk for a military base. I don't know why there would even be a suspicion of stolen goods for that sort of thing. Well, the difference in all of this is that we're talking about lunar material that only could have come back to Earth through the government's process. In the case of a bar association, when you're dealing with a private association, giving someone a gavel, that's a different context than if you were to give me the light in front of you that's government property and say, you know, I appreciate how you did this argument today. Have my light. You would be giving me government property that you wouldn't have otherwise had authority to give me. I don't know if it's true, because I never argued before the Supreme Court, but I've heard that when you do, you get these two quill pens. And I don't think you get a title certificate. Or a search warrant. No, no, the quills in the Supreme Court are different. I mean, the difference being that this is... But they could have been stolen from the bench or something. It's just that the inference you usually draw from that sort of commemorative souvenir is that it's okay. But the moon isn't a souvenir. I think that's the big difference. But if, in fact, Neil Armstrong gave it to her husband, that's a whole different matter, isn't it? Yes. I mean, I assume you're not... I mean, if Neil Armstrong had given it to her... That's what she said in her note to NASA. Right, and she wasn't prosecuted. But, again, anyone can say anything. NASA still had to investigate. But they could have just said, you know, you're not allowed to have that moon rock. And I think that probably would have been the end of it. Well, as the testimony shows, they didn't know whether it was a true moon rock until they actually got it and tested it after the fact. It wasn't... At that time, nobody knew whether it was a real... Well, actually, I don't even believe she knew for sure that it was a real moon rock. May I return to one other issue that was raised by Judge Kleinfeld, and that's the black market? Here's what I found, and you correct me if I'm wrong on this. I have in her declaration that she was talking to the confidential informant, Jeff, and this is her declaration. I remember he did start talking some... I explained to him I had no other means, which I explained, other than through auction houses to check about selling the property. I explained how the auction houses were not helping and told Jeff I didn't know why. He did not offer an explanation either. As we spoke in later conversations, I remember he started talking some jumble about selling J-2 rockets. But I didn't know what those were. At some point, he talked about black markets, but as I said, I didn't have any such contacts. So is that what we're talking about here? Yeah, although if you go back and review the actual transcripts that were attached to the search warrant affidavit, her testimony... What she says in her declaration is not exactly the same as what the testimony was or what her statements were to the confidential informant during the discussion. That's why I referenced the other portions. Thank you, counsel. Thank you, Your Honor. The case is argued to be submitted for decision. Thank you both for your arguments this morning.
judges: Kleinfeld, Thomas, Nguyen